UNDER SEAL

FILED16 JUL '20 17:57USDC-ORP

UNDER SEAL

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:20-cr-** 00228-SI |
| **v.** | **INDICTMENT** |
| **ROBERT J. JESENIK, N. SCOTT GILLIS, ANDREW N. MacRITCHIE, BRIAN K. RICE,** | **18 U.S.C. §§ 1014, 1343, 1344, 1349, 1956(h), and 1957** |
| | **Forfeiture Allegations** |
| **Defendants.** | **UNDER SEAL** |

THE GRAND JURY CHARGES:

GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1. Robert J. Jesenik ("defendant Jesenik") was a resident of West Linn, Oregon.

2. N. Scott Gillis ("defendant Gillis") was a resident of Lake Oswego, Oregon.

3. Andrew N. MacRitchie ("defendant MacRitchie") was a resident of Lake Oswego, Oregon, and New York, New York.

4. Brian K. Rice ("defendant Rice") was a resident of Portland, Oregon.

5. Defendant Jesenik founded the Aequitas group of companies, which were located in Lake Oswego, Oregon, and included, among others, Aequitas Management, LLC, Aequitas Holdings, LLC, Aequitas Commercial Finance, LLC, Aequitas Capital Management, Inc., and Aequitas Investment Management, LLC (hereinafter collectively referred to as "Aequitas").

Defendants and others used Aequitas Commercial Finance ("ACF") and other Aequitas-related companies to solicit investors through the issuance of promissory notes and interests in Aequitas-created investment funds, many of which were purportedly backed by trade receivables in education, health care, transportation, and other consumer credit areas.

6. Defendant Jesenik was Chief Executive Officer in the Aequitas structure, controlled the Aequitas structure, and had ultimate decision-making authority over Aequitas's activities.

7. Defendant Gillis was Chief Operating Officer and Chief Financial Officer within the Aequitas structure as of January 2015. As such, defendant Gillis was responsible for directing Aequitas's overall financial policies and accounting functions. He established and maintained Aequitas's accounting principles, practices, procedures and initiatives, prepared financial reports and presented findings and recommendations to the executive team, oversaw all financial functions including accounting, budget, credit, insurance, tax, and treasury, and designed and coordinated a wide variety of accounting and statistical data and reports.

8. Defendant MacRitchie was an Executive Vice President and the Chief Compliance Officer within the Aequitas structure. As Chief Compliance Officer, defendant MacRitchie was responsible for the development and implementation of risk management and compliance processes and procedures. He oversaw all accounting, legal, and audit functions, and participated in fundraising. Defendant MacRitchie also established and operated Aequitas's New York Office and directed Aequitas's "Lux Fund," a Luxembourg-based fund used to solicit international investors.

9. Defendant Rice was an Executive Vice President within the Aequitas Structure and President of Aequitas Wealth Management as of October 2014. Among his responsibilities

at Aequitas, defendant Rice oversaw the solicitation of investments through registered investment advisors (hereinafter referred to as RIAs) and managed Aequitas's affiliated RIAs.

**COUNT 1**
**(Conspiracy to Commit Mail and Wire Fraud)**
**(18 U.S.C. § 1349)**

10. Beginning no later than in or about June 2014, and continuing through in or about February 2016, in the District of Oregon and elsewhere, defendants Jesenik, Gillis, MacRitchie, Rice, and others, known and unknown, knowingly and willfully conspired, combined, confederated, and agreed with each other and with others, known and unknown, to commit mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.

**MANNER AND MEANS AND SCHEME TO DEFRAUD**

11. Defendants and others, known and unknown, used the following manner and means to carry out the conspiracy and scheme to defraud:

12. Defendants and others solicited individuals to invest in a variety of notes and investment funds, many of which were allegedly backed by trade receivables in education, health care, transportation, and other consumer credit areas.

13. Defendants and others created and approved, and caused to be created and approved, promotional and other investment materials that contained material misrepresentations, including material misrepresentations about the uses of investor money, the financial health and strength of Aequitas, Aequitas's investments and investment strategies, and the inherent risks of those investments and investment strategies.

14. Defendants mailed and emailed, and caused others to mail and email, the promotional and other investment materials to investors and investment advisors, with each mailing or wire being a separate execution of the scheme to defraud.

15. These promotional materials also omitted material facts, including that Aequitas was consistently in liquidity and cash-flow crises, that defendants and others used the majority of new investor money to repay prior investors and to pay operating expenses rather than buy trade receivables, and that there was insufficient collateral to secure the notes sold to investors.

16. Defendants and others made similar material misrepresentations and omissions in person when soliciting and discussing the status of investments with investors and investment advisors.

17. In order to raise funds to redeem previously issued notes and to address other urgent liquidity shortfalls, including operating expenses, defendants and others offered additional notes with higher interest rates in order to entice investors. Defendants and others led investors to believe that the majority of the investors' money would be used to buy trade receivables or other income-generating assets. Instead, defendants and others used the majority of investor funds to pay operating costs and to repay other investors.

18. Defendants and others used an intercompany loan to Aequitas Holdings, LLC (hereinafter referred to as the Holdings Note) to prop up ACF and other Aequitas entities and to mislead investors. Defendants and others counted the Holdings Note as an asset even though defendants and others knew that the note was woefully under-collateralized and could not be repaid without the occurrence of several speculative contingencies, things that were concealed from investors.

19. Based on defendants' and others' misrepresentations and omissions, including material misrepresentations and omissions of material facts about the nature of the various investments and investment strategies, the use of investor proceeds, and the risk of the

investments, individuals invested more than $400 million between January 2014 and February 2016.

20. Defendants and others caused investors to mail their investments or to transfer their investments via wire, with each mailing or wire being a separate execution of the scheme to defraud.

21. Rather than use or invest the money as implied or promised, defendants and others used investor money to make redemption and interest payments to prior investors and to pay the operating expenses of Aequitas. Those costs included lucrative salaries for defendants and others, private jets and pilots, office renovations, an office expansion in New York, and extravagant events for staff, management, owners, and investors.

22. Despite accumulating operating losses that defendants and others concealed in the above-described Holdings Note, defendants and others continued to raise funds from new investors and convinced prior investors both to delay redemptions and to invest additional money.

23. Defendants and others caused investor money to be transferred via wire between various financial accounts to facilitate the conspiracy and scheme to defraud, including by diverting investor money, with each wire being a separate execution of the scheme to defraud.

24. Defendants and others intentionally did not disclose the following material facts to outside accounting and legal firms: the Aequitas companies were consistently in liquidity and cash-flow crises; defendants and others used the majority of investor money to repay investors and to pay operating expenses rather than to buy trade receivables or other investments; and there was insufficient collateral to secure the notes sold to investors.

///

25. Defendants and others also failed to disclose the truth about the Holdings Note, including that it was used to conceal accumulating operating losses and that it was severely under-collateralized.

26. In or about March 2016, Aequitas was taken into receivership, at which time investors were owed more than $600 million.

All in violation of 18 U.S.C. § 1349.

**COUNTS 2-20**
**(Wire Fraud)**
**(18 U.S.C. § 1343)**

27. Paragraphs 1 through 9 of the Introductory Allegations and paragraphs 11 through 26 of the Manner and Means and Scheme to Defraud of Count 1 are incorporated herein.

28. On or about the dates set forth below in each Count, in the District of Oregon and elsewhere, defendants and others, for purposes of attempting to execute and executing the above-described material scheme to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, as well as omissions of material facts, knowingly caused the following communications via interstate wire:

| COUNT | DATE | DESCRIPTION OF EXECUTION |
|---|---|---|
| 2 | August 4 and 5, 2015 | An email exchange between co-conspirator Oliver, defendant Jesenik, and defendant Rice, Subject: Redemption Update. |
| 3 | September 2 and 3, 2015 | An email exchange between co-conspirator Oliver and defendant Rice, Subject: Redemption Spreadsheets – 9-2-15. |
| 4 | September 30 and October 1, 2015 | An email exchange between defendant Jesenik, defendant Gillis, defendant Rice, and co-conspirator Oliver, Subject: Cash Dash 9/30. |
| 5 | October 1, 2015 | A $500,000 wire to ACF Private Note account 7834 at Bank of America. |
| 6 | October 1, 2015 | A $500,000 wire to ACF Private Note account 7834 at Bank of America. |

| | | |
|---|---|---|
| 7 | October 7, 2015 | A $1,000,000 wire to ACF Private Note account 7834 at Bank of America. |
| 8 | November 3, 2015 | A $500,000 wire to ACF Private Note account 7834 at Bank of America. |
| 9 | November 16, 17 and 18, 2015 | An email exchange between defendant Rice and an RIA, Subject: Aequitas DD. |
| 10 | November 25 and 30 and December 1, 2015 | An email exchange between co-conspirator Oliver, defendant Rice, and defendant Jesenik, Subject: [blank]. |
| 11 | December 6 and 7, 2015 | An email exchange between defendant Rice, defendant Jesenik, and co-conspirator Oliver, Subject: Redemptions. |
| 12 | December 8, 2015 | A $500,000 wire to the ACF Private Note account 7834 at Bank of America. |
| 13 | December 8, 2015 | A $500,000 wire to the ACF Private Note account 7834 at Bank of America. |
| 14 | December 8, 2015 | A $500,000 wire to the ACF Private Note account 7834 at Bank of America. |
| 15 | December 9, 2015 | An email from an Aequitas employee copied to defendant Rice, Subject: redemption messaging. |
| 16 | December 23, 2015 | A $2,000,000 wire to IOF II account 6621 at Bank of America. |
| 17 | December 23, 2015 | A $269,827.36 wire to IOF II account 6621 at Bank of America. |
| 18 | December 30, 2015 | A $2,000,000 wire to IOF II account 6621 at Bank of America. |
| 19 | December 30, 2015 | A $354,000 wire to IOF II account 6621 at Bank of America. |
| 20 | December 29 and 30, 2015 | An email exchange between Aequitas Investor Services and an RIA, Subject: Stern – Case: 00011534:ref:_00D30XID._500333sJgdl:ref |

All in violation of 18 U.S.C. § 1343.

**COUNT 21**
**(Conspiracy to Commit Money Laundering)**
**(18 U.S.C. § 1956(h))**

29. Paragraphs 1 through 9 of the Introductory Allegations and paragraphs 11 through 26 of the Manner and Means and Scheme to Defraud of Count 1 are incorporated herein.

30. Beginning no later than in or about June 2014 and continuing through in or about February 2016, in the District of Oregon and elsewhere, defendants and others, known and

unknown, did knowingly combine, conspire, and agree with each other and with others, known and unknown, to knowingly engage and to attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 that was derived from a specified unlawful activity (mail and wire fraud) in violation of 18 U.S.C. § 1957.

**MANNER AND MEANS OF THE CONSPIRACY**

31. The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

32. Defendants and others, known and unknown, engaged in the scheme to defraud set forth in Count 1 of this Indictment, raising more than $400 million between January 2014 and February 2016.

33. Defendants engaged in or caused the monetary transactions set forth below in Counts 22-31, each involving more than $10,000 from the proceeds of the scheme to defraud described in Count 1.

**COUNTS 22-31**
**(Money Laundering)**
**(18 U.S.C. § 1957)**

34. Paragraphs 1 through 9 of the Introductory Allegations and paragraphs 11 through 26 of the Manner and Means and Scheme to Defraud of Count 1 are incorporated herein.

35. As set forth in each count below, in the District of Oregon and elsewhere, defendants and others knowingly engaged in and attempted to engage in monetary transactions, by, through, and to financial institutions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000 and was derived from a specified unlawful activity (mail and wire fraud as charged in Count 1 of this Indictment):

| COUNT | MONETARY TRANSACTION |
|---|---|
| 22 | On or about October 1, 2015, a $246,887.67 transfer via wire from account 7834 to an account at California Bank and Trust for an interest payment to an investor. |
| 23 | On or about October 1, 2015, a $126,085.99 transfer via wire from account 7834 to an account at California Bank and Trust for an interest payment to an investor. |
| 24 | On or about October 1, 2015, a $78,616.44 transfer via wire from account 7834 to an account at Wells Fargo Bank for an interest payment to an investor. |
| 25 | On or about October 1, 2015, a $20,965.23 transfer via wire from account 7834 to an account at Torrey Pines Bank for an interest payment to an investor. |
| 26 | On or about October 7, 2015, a $1,301,495.89 transfer via wire from an account ending in 7834 to an account at MB Financial Bank for a redemption payment to an investor. |
| 27 | On or about October 15, 2015, a $3,000,000 transfer via wire from an account ending in 8314 to an account ending in 7815, in part to pay Aequitas's operating expenses and to make redemption payments to investors. |
| 28 | On or about November 4, 2015, a $350,000 transfer via wire from an account ending in 7815 to an account ending in 8314 for a redemption payment to an investor. |
| 29 | On or about December 9, 2015, an $848,076.70 transfer via wire from an account ending in 7815 to an account at Columbia State Bank for a referral payment. |
| 30 | On or about December 23, 2015, a $1,500,000 transfer via wire from an account ending in 7834 to an account at Wells Fargo Bank for a redemption payment to an investor. |
| 31 | On or about February 11, 2016, a $605,016.42 transfer via wire from an account ending in 8489 to an account at JP Morgan Chase for payroll. |

All in violation of 18 U.S.C. § 1957.

**Count 32**
**(Bank Fraud)**
**(18 U.S.C. § 1344)**
**(Defendants Jesenik and Gillis)**

36. Paragraphs 1 through 9 of the Introductory Allegations and paragraph 18 of Count 1 are incorporated herein.

37. From June 2014 through February 2016, Aequitas financed a substantial share of its operations by issuing high-yield promissory notes through the ACF Private Note program.

38. Defendants Jesenik and Gillis managed the redemption of these promissory notes. They routinely received notice of, and normally approved, all outgoing payments for Private Note redemptions.

39. On or about January 8, 2016, defendants Jesenik and Gillis and others were advised that ACF was overdue in redeeming more than $10 million in promissory notes that ACF had issued through the Private Note program. They were also advised that Aequitas's treasury had deferred redemption payments for all of the overdue notes at least until January 11, 2016.

40. Before that date, according to the information defendants Jesenik and Gillis and others had received, ACF would be in default on at least $2.86 million in outstanding promissory notes. None of those notes was ever redeemed.

41. In addition to its other fundraising efforts, Aequitas also borrowed money directly from financial institutions to purchase trade receivables. One of these financial institutions was Wells Fargo Bank, N.A. ("Wells Fargo"), whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

42. Aequitas and Wells Fargo entered into a Receivables Loan Agreement ("RLA") on or about January 12, 2015. In effect, the RLA established a $100 million line of credit on which Aequitas could draw to purchase trade receivables if Aequitas certified that it was not in default, or potential default, as to certain conditions. Among these conditions were:

a. ACF had not defaulted on payments due to any other creditors in relation to loans worth more than $2.5 million in total outstanding principal;

///

///

b. ACF was not required to register as an "investment company" under the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder ("the 1940 Act"); and

c. ACF had delivered by July 31, 2015, an opinion letter from outside legal counsel confirming that ACF was not required to register as an "investment company" under the 1940 Act.

43. On or about June 30, 2015, defendant Gillis signed an amended version of the RLA on behalf of Aequitas, but the foregoing requirements remained in full force and effect.

44. Sidley Austin LLP served as outside legal counsel to Aequitas. In order to conclude that ACF was not required to register as an "investment company" under the 1940 Act, Sidley Austin LLP advised that ACF could not hold non-qualifying assets worth more, collectively, than 45% of the total value of ACF's assets.

45. Defendants Jesenik and Gillis understood that ACF's largest single asset, the Holdings Note, was a non-qualifying asset for purposes of the 1940 Act. ACF valued the Holdings Note at its face value of not less than $140 million. With that valuation, more than 51% of ACF's assets, by value, were non-qualifying assets, requiring ACF to register as an "investment company" under the 1940 Act.

46. From not later than July 28, 2015, and continuing through at least January 15, 2016, defendants Jesenik and Gillis knowingly and willfully devised and intended to devise a material scheme to defraud Wells Fargo, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

///

///

## SCHEME TO DEFRAUD

47. It was part of this scheme that:

48. Defendants Jesenik, Gillis, and others fraudulently procured from Aequitas's outside counsel, Sidley Austin LLP, an opinion that ACF was not required to register as an "investment company" under the 1940 Act by materially misrepresenting the value of non-qualifying assets held by ACF. Specifically, on July 28, 2015, defendant Gillis signed a certificate for Sidley Austin LLP, warranting that at least 55% of ACF's total assets were qualifying assets (and thus not more than 45% of ACF's assets were non-qualifying assets). For purposes of this certificate, defendants Jesenik and Gillis and others deemed the value of the Holdings Note to be approximately $65 million, knowing that this amount was less than half the value they assigned to the Holdings Note for all other purposes, including the second-quarter financial reports that ACF later submitted to Wells Fargo.

49. Defendants Jesenik and Gillis then caused Sidley Austin LLP to deliver to Wells Fargo a letter, also dated July 28, 2015, conveying the fraudulently procured opinion that ACF was not required to register as an "investment company" under the 1940 Act.

50. On or about January 15, 2016, defendant Gillis signed, and defendants Jesenik and Gillis caused to be submitted to Wells Fargo, an "Advance Notice," requesting that Wells Fargo advance $4.2 million to Aequitas under the terms of the RLA. As part of this "Advance Notice," defendant Gillis certified, among other things, that "[n]o Potential Event of Default or Event of Default has occurred and is continuing."

## EXECUTION OF SCHEME TO DEFRAUD

51. From not later than July 28, 2015, and continuing through at least January 15, 2016, in the District of Oregon and elsewhere, defendants Jesenik and Gillis knowingly and

willfully executed and attempted to execute the above-described material scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses and representations, moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of Wells Fargo Bank, N.A., a federally insured financial institution.

All in violation of 18 U.S.C. § 1344.

**COUNT 33**
**(Conspiracy to Commit Bank Fraud)**
**(18 U.S.C. § 1349)**
**(Defendants Jesenik and Gillis)**

52. Paragraphs 1 through 9 of the Introductory Allegations and 37 through 51 of Count 32 are incorporated herein.

53. From not later than July 28, 2015, and continuing through at least January 15, 2016, in the District of Oregon and elsewhere, defendants Jesenik and Gillis and others, known and unknown to the grand jury, did conspire, confederate, and agree with each other to commit the offense of bank fraud as charged in Count 32 of this Indictment.

All in violation of 18 U.S.C. § 1349.

**COUNT 34**
**(False Statement on Loan Application)**
**(18 U.S.C. § 1014)**
**(Defendants Jesenik and Gillis)**

54. Paragraphs 1 through 9 of the Introductory Allegations and 37 through 51 of Count 32 are incorporated herein.

55. On or about January 15, 2016, in the District of Oregon, defendants Jesenik and Gillis knowingly made a false statement for the purpose of influencing the action of Wells Fargo, a federally insured financial institution, in connection with an application for an advance of $4.2 million, in that they made and caused to be transmitted a statement certifying, among other

things, that "[n]o Potential Event of Default or Event of Default has occurred and is continuing," when in truth and in fact, as they well knew, ACF had already defaulted on more than $2.5 million in principal repayments to holders of Private Notes and expected to default on millions more in the coming weeks.

All in violation of 18 U.S.C. § 1014.

**FIRST FORFEITURE ALLEGATION**
**(18 U.S.C. § 982(a)(1)(A))**

56. Upon conviction of one or more of the offenses alleged in Counts 1-21 and 32-34 of this Indictment, defendants shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting or derived from proceeds obtained directly or indirectly as a result of the violations, including but not limited to a money judgment for a sum of money equal to the amount of property involved in the conspiracy.

57. If the above-described forfeitable property, as a result of any act or omission of defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

///

///

**SECOND FORFEITURE ALLEGATION**
**(18 U.S.C. § 982(a)(1))**

58. Upon conviction of the offenses alleged in Count 22-31 of this Indictment, defendant shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1), any and all property, real or personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to a money judgment for a sum of money equal to the amount of property involved in those offenses.

59. If the above-described forfeitable property, as a result of any act or omission of defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

Dated: July 16, 2020

A TRUE BILL.

[redacted]

OFFICIATING FOREPERSON

Presented by:

BILLY J. WILLIAMS
United States Attorney

SCOTT E. BRADFORD, OSB #062824
RYAN W. BOUNDS, OSB #000129
Assistant United States Attorneys